Filed 11/19/20  E.B. v. Superior Court CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| E.B.,<br><br>　　　　Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF<br>SAN BERNARDINO COUNTY,<br><br>　　　　Respondent;<br><br>SAN BERNARDINO COUNTY<br>CHILDREN AND FAMILY SERVICES,<br><br>　　　　Real Party in Interest. | E075715<br><br>(Super.Ct.No. J282461)<br><br>OPINION |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Annemarie G. Pace, Judge.  Petition denied.

Friedman and Cazares and Kelsey Yoro-Bacay for Petitioner.

No appearance for Respondent.

1

Michelle D. Blakemore, County Counsel, Dawn M. Martin, Deputy County Counsel, for Real Party in Interest.

I

INTRODUCTION

This is a petition for extraordinary writ challenging the findings and orders of the juvenile court in setting a hearing pursuant to Welfare and Institutions Code section 366.26.[1]  (§ 366.26, subd. (l ); Cal. Rules of Court, rule 8.452.)  Petitioner E.B. (Mother) is the mother of 15-month-old E.G.[2]  Mother had struggled with substance abuse and a criminal lifestyle for the past eight years.  E.G. was removed from Mother's custody at birth after Mother tested positive for methamphetamines during delivery.

Mother contends the juvenile court erred in terminating her services and setting a section 366.26 hearing because the court failed to consider her particular barriers, the department failed to provide her with reasonable reunification services, and she had regularly participated and substantially complied with her case plan.  We find that the record supports the court's findings and orders, and deny the petition.

---

[1]  All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2]  Mother is also the mother of two older children, 15-year-old E.S. and 12-year-old W.G., Jr.  Mother's two older children are not the subjects of this appeal and have resided with the maternal grandmother for most of their lives.  E.G.'s father, R.G. (Father), is not a party to this appeal.

II

FACTUAL AND PROCEDURAL BACKGROUND

The family came to the attention of the San Bernardino County Children and Family Services (CFS) in August 2019, after Mother tested positive for methamphetamines while giving birth to E.G. E.G. had medical issues following her birth and was being monitored by hospital staff. The social worker met with hospital staff and was informed that E.G. was on antibiotics and would be on medication for several days. Hospital staff also stated that Mother was tested twice for methamphetamines with two positive results and, therefore, the positive result could not have been a false positive. E.G. had tested negative for drugs. Hospital staff further noted that Mother had visited E.G., but did not spend much time with her and had not shown much interest in her.

The social worker made an unannounced visit to Mother's home, which belonged to the maternal grandmother. Mother reported she had been residing with the maternal grandmother since April 2019 after being released from jail for identity theft and was on probation. She also stated that she had been incarcerated several times in the past but did not remember the substance of her criminal history. Mother denied using any type of drugs, did not understand why she had tested positive for methamphetamines, and claimed she may have been around people using it and ingested it somehow. She also stated that she had experimented with methamphetamines and marijuana when she was 15 years old, but that she did not like it. Mother further reported that the maternal

3

grandmother had guardianship of her two older children and that she was willing to move out of the maternal grandmother's home so the children's lives would not be disrupted. She noted that she was willing to test for CFS and cooperate with CFS, because she did not want E.G. removed from her care over a "misunderstanding."

The social worker also spoke with the maternal grandmother, who was in the process of obtaining legal guardianship of the older children but had not yet submitted the request to the court. The children had been in the maternal grandmother's care for about 10 years and called her "'mom.'" Approximately two years prior while Mother was in prison, Mother had signed a form authorizing the maternal grandmother to make decisions over the children regarding school and medical decisions. The maternal grandmother was unaware of the exact reasons as to why Mother was incarcerated, but she noted that Mother began making poor decisions when she turned 18 years old. The maternal grandmother indicated that Mother was not known to use drugs and was surprised she tested positive for methamphetamines.

The social worker also spoke with the older children. E.S. asserted that she viewed the maternal grandmother as her mother and called Mother by her first name. E.S. enjoyed living with the maternal grandmother, did not want to be removed from her care, and denied noticing Mother using any type of substance. W.G. confirmed the statements made by E.S. and added that he had a "'great' life" with the maternal grandmother. W.G. also stated that he was "scared about being removed" from the maternal grandmother's home and did not want to live anywhere else.

The paternal aunt called the social worker indicating she wanted to be considered for placement of E.G. The paternal aunt stated that she had a distant relationship with Father, after he had his two older children removed from his care by the Los Angeles County Department of Children and Family Services.[3] The paternal aunt also reported the concerns she had with Mother and Father. She stated that she saw the parents arguing when she visited E.G. at the hospital and that the parents were known to embrace the "'party life'" and not "'have it together.'"

On September 11, 2019, CFS obtained a detention warrant and the children were placed in protective custody. When the social worker served the detention warrant, the worker observed Mother to have involuntary body movements. Mother admitted that she had smoked methamphetamine and that the last time she had used was when she tested positive at the hospital. Mother's criminal history included multiple charges for drug possession between 2012 and 2019. Mother was asked to drug test, but she refused to do so.

On September 13, 2019, CFS filed petitions on behalf of E.G. and her siblings pursuant to section 300, subdivision (b) (failure to protect), in relevant part, due to Mother's ongoing struggles with substance abuse and a criminal lifestyle.

On September 16, 2019, the juvenile court formally detained the children. The parents were provided services pending the jurisdictional/dispositional hearing, including visitation once a week for two hours. The parents were also ordered to drug test. The

[3] In July 2013, Father's older children were removed from his care due to substance abuse and domestic violence.

5

older children were maintained in the maternal grandmother's home, and E.G. was placed in a foster home. The maternal grandmother was unable to provide the more time-consuming care necessary for E.G.

CFS recommended reunification services be provided to the parents. Father admitted to having a history of methamphetamine use but had not used since 2010, and his recent drug test indicated a negative drug test result. When asked about knowledge of Mother's methamphetamine use, he initially denied it. He later stated that he had met Mother through a mutual friend who was known to use drugs and suspected Mother used drugs.

When the social worker spoke with the two older children on September 20, 2019, E.S. reported that Mother had only moved in with them after being pregnant with E.G. and that Mother did not see them often. E.S. also indicated that Mother was usually half asleep or in her room so they did not spend much time together. W.G. confirmed Mother would be gone for days at a time and had only started living with them once she was pregnant. Both children considered the maternal grandmother their mother and looked to her to provide their daily needs.

On September 25, 2019, the social worker spoke with Mother again about her substance abuse. She said she began using marijuana at 15 years old and methamphetamines when she was 17 years old but only while going out. She had never sought substance abuse treatment because she did not believe she had a problem and could stop when she liked. As to her recent positive drug test for methamphetamines, she

6

claimed she was staying with a cousin who used methamphetamines and must have drank some of her juice or soda that had the drugs in it. Mother failed to drug test on September 24, 2019. Mother, however, visited the children and the visit appeared appropriate.

On October 18, 2019, E.G. was placed with her maternal cousins.

After Mother waived her rights, on October 30, 2019, the juvenile court found true the allegations in the petitions and Mother was provided with reunification services. Mother's case plan included participation in general counseling, a parenting class, a substance abuse outpatient program, random drug testing, and a 12-step program.

By the time of the six-month review hearing on April 30, 2020, CFS recommended reunification services be terminated and a section 366.26 hearing be set to establish a permanent plan of adoption for E.G. In December 2019, the social worker provided Mother with a referral for a family shelter. However, in March 2020, Mother reported she was homeless and looking for a sober living home, and a couple of weeks later her status had not changed as she was still homeless and not residing in a sober living home. She continued to have weekly visits with the children but had not enrolled in substance abuse counseling. She had attended parenting classes and individual therapy. Nonetheless, she continued to test positive for methamphetamines and/or failed to randomly drug test.

In September 2019, Mother was referred for an assessment with a substance abuse counselor. In January 2020, she was provided information for substance abuse classes.

Mother did not complete the assessment until February 4, 2020, and it was noted that she was informed she did not qualify for outpatient services due to reporting she had not consumed substances since February 2019. She also cancelled several drug tests between October 2019 and January 2020, and tested positive for drugs on February 10, 2020, and in early March 2020. The social worker attempted to obtain a progress report from Mother's parenting classes and therapy, but Mother only provided the social worker with her sign-in sheet from her sessions.

The six-month review hearing set for April 30, 2020, was continued to June 4, 2020, as a result of a general order related to COVID-19. Mother did not attend the June 4, 2020 hearing, and the matter was set contested and continued.

In a July 9, 2020 addendum report, CFS continued to recommend termination of services and setting of a section 366.26 hearing. The social worker observed Mother's visits and noted that Mother failed to engage with E.G. and was not bonded with her. Mother had not held E.G. for longer than 30 seconds during any visit over the past nine months. In addition, Mother had been provided with over six months of services and had failed to obtain sobriety within that timeframe. She tested positive for amphetamines upon intake to Gibson House for Women (Gibson House) on May 26, 2020. Meanwhile, E.G. had been thriving in her placement and was bonded to her caregivers. E.G.'s caregivers had met E.G.'s emotional, medical, developmental, and educational needs and had taken E.G. to her therapy sessions for the tremors she experienced due to withdrawals from Mother's substance abuse.

At the July 9, 2020 contested six-month review hearing, Mother's counsel advised the court that Mother had tested positive for COVID-19 and could not attend court. Therefore, the matter was reset for August 5, 2020. Mother could not attend the August 5, 2020 hearing since she again tested positive for COVID-19, so the matter was continued to September 15, 2020.

Mother cancelled an August 28, 2020 visit because she had no transportation. Mother later had two in-person visits, and it was reported that she engaged with E.G. Mother also provided documentation that she had completed the inpatient substance abuse program at Gibson House that she began on May 26, 2020, was attending Alcoholics Anonymous and Narcotics Anonymous meetings, completed a parenting program, and tested negative for drugs.

The contested six-month review hearing was held on September 15, 2020. Mother testified that she had completed an inpatient substance abuse program at Gibson House and was isolated during the time due to COVID-19 with cameras watching her at all times and that she was unable to go outside. She had also enrolled in a six-month outpatient substance abuse program. She stated that she did not enroll in the inpatient program until May 2020 because initially she was unable to admit she had a drug problem. As to housing, she explained that she could live in a sober living facility and have the children with her as well.

While she was living in the inpatient program and after testing positive for COVID-19, Mother explained that daily video visits were arranged so she could visit

9

every day with E.G. for approximately 15 minutes.  For the last two visits in September 2020, Mother was able to have in-person visits.  Mother admitted that she had used methamphetamines in August 2019 and was untruthful when she had earlier reported that she stopped using in February 2019.  She was also using methamphetamines right before she entered the inpatient substance abuse program at Gibson House in May 2020 and her "clean date was May 24th or 25th."  Mother admitted that the reason she was unable to enroll in a prior referred program was because she had lied to the program provider about when she tested positive.  As to visits, she acknowledged that she had no visits, including video, from March to May 2020, and that she began having video visits with E.G. in June 2020.

The social worker testified that Mother was difficult to deal with prior to Mother enrolling in the inpatient drug program.  Since Mother completed the program, the social worker explained that she noticed a change in Mother's attitude, and Mother was more compliant.  However, the social worker was not sure how motivated Mother was since her sobriety was very recent.  The social worker also noted that the quality of Mother's visits with E.G. were better since Mother had completed the inpatient program and that Mother was more engaged with E.G.  The social worker stated that her concern with offering Mother more services was the lack of bonding between Mother and E.G.  She explained that Mother did not engage with E.G. from September 2019 until March 2020, that Mother had only video visits for some time afterwards between the end of May through August 2020, and that Mother had just resumed in-person visits.  The social

10

worker further noted that Mother had never lived on her own without support since maintaining sobriety.

Mother's counsel objected to terminating Mother's services, arguing Mother had completed her case plan and demonstrated her ability to benefit. Mother's counsel noted that the 12-month review hearing would be in six weeks, and if bonding was an issue, then the court could increase visitation between Mother and E.G. E.G.'s counsel argued that although Mother had made significant progress, Mother delayed initiating the inpatient program and did not believe reunification or continuing services was in E.G.'s best interest. E.G.'s counsel explained that E.G. was removed as an infant, Mother had never developed a bond with E.G., and six or seven weeks of additional services would not change that relationship. E.G.'s counsel also noted that Mother had not demonstrated she could continue a sober lifestyle without significant assistance. CFS's counsel also argued that Mother had almost a year to reunify and has had a short length of sobriety and that Mother had an opportunity to engage with E.G. for six months and had only recently begun engaging with her.

Following argument, the juvenile court found CFS had provided reasonable services, terminated reunification services, and set a section 366.26 hearing. The court noted that the six-month hearing would have been held in April 2020 if not for the COVID-19 shutdown in March 2020 and that in April 2020, the record was clear that visits were not going well and Mother was not in compliance with her case plan. The court also stated that Mother essentially received more services because of the COVID-

19 shutdown, and to her credit, engaged in services. The court further explained that E.G. was removed at birth and Mother had no significant bond with her and that E.G.'s only parent had been her current caretakers. The court noted that Mother was not raising her other children but rather, the maternal grandmother was raising the children. Although the court recognized that Mother had made significant progress in her case plan since May 2020, it found there was no substantial probability E.G. could be returned to her care in six weeks given the lack of bonding and short time of sobriety.

On September 15, 2020, Mother filed a timely notice of intent to file a writ petition.

III

DISCUSSION

Mother argues that the juvenile court erred in terminating her services and setting a section 366.26 hearing because the court failed to consider her barriers or unusual circumstances, namely her positive COVID-19 test results, that prevented her access and ability to maintain contact with E.G. She also contends CFS failed to provide her with reasonable reunification services because it failed to give her the opportunity to visit E.G. in person and that the juvenile court erred in terminating her services because she had regularly participated and substantially complied with her case plan.

A.     *Unusual or Extenuating Circumstances*

Section 366.21, subdivision (e)(l), provides in pertinent part: "The failure of the parent or legal guardian to participate regularly and make substantive progress in court-

ordered treatment programs shall be prima facie evidence that return would be detrimental. In making its determination, the court shall review and consider the social worker's report and recommendations and the report and recommendations of any child advocate appointed pursuant to Section 356.5; and shall consider the efforts or progress, or both, demonstrated by the parent or legal guardian and the extent to which he or she availed himself or herself of services provided, taking into account the particular barriers to a minor parent or a nonminor dependent parent, or an incarcerated, institutionalized, detained, or deported parent's or legal guardian's access to those court-mandated services and ability to maintain contact with his or her child."

Citing to *In re Elizabeth R.* (1995) 35 Cal.App.4th 1774 (*Elizabeth R.*), Mother contends the juvenile court should have considered her barriers or unusual circumstances before terminating her services. Essentially, she argues that because she was unable to visit E.G. in person in the months of June, July, and August 2020 due to her positive COVID-19 test results and limitations through video visits to bond with E.G., the juvenile court should have found extenuating circumstances and extended services, comparing her situation "of a parent who is unable to leave a facility or is otherwise barred from physically seeing her child."

In *Elizabeth R.*, the juvenile court was working under the "erroneous belief" that it could not extend the reunification period beyond the 18-month period and thus was "compelled to either terminate reunification services or return the minor to the [parent]." (*Elizabeth R.*, *supra*, 35 Cal.App.4th at pp. 1777-1778.) The mother in *Elizabeth R.* had

substantially complied with her reunification plan, but reunification was compromised by the "unusual circumstance[ ]" of her hospitalization for mental illness. (*Id*. at pp. 1777, 1787.) The juvenile court, though "impressed with [the mother's] progress and optimistic about her ability to sustain her mental health," was "frustrated by the department's insistence" that the court only had two options, to terminate services and schedule a selection and implementation hearing or to return the children. (*Id*. at pp. 1782-1783.) Accordingly, the court terminated services. (*Id*. at p. 1783.) The Court of Appeal reversed, explaining that the juvenile court had been "unaware it retained some discretion to continue services beyond the 18-month period," and that section 352 "provides an emergency escape valve in those rare instances in which the juvenile court determines the best interests of the child would be served by a continuance of the 18-month review hearing." (*Id*. at pp. 1794, 1798-1799.)

The circumstances of the instant case are markedly different. To begin with, it involves an assessment made at a six-month review hearing, not an 18-month review hearing. More significantly, Mother did not substantially comply with her case plan until well after the initial six-month review hearing, nor were the circumstances of her case "unusual" or "extenuating." As we have recounted, Mother came to the attention of CFS in August 2019, was offered numerous services which she failed to participate in and waited until May 26, 2020, to begin any treatment. In short, Mother continually refused to avail herself of an array of services, and the fact that she finally did so at the eleventh hour does not constitute "extenuating circumstances."

14

Likewise, Mother's positive COVID-19 test results also do not constitute a barrier or unusual circumstances. Mother omits the fact that she was able to visit E.G. in person during the initial six months of services from September 2019 through March 2020. During that time, although Mother visited E.G., she was not engaged with E.G. and did not hold E.G. longer than 30 seconds at any visit. Furthermore, Mother had those initial six-to-seven months to enroll in an inpatient substance abuse program, but she failed to do so and continued to test positive for methamphetamines. Assuming that the April 30, 2020 six-month hearing had gone forward as originally scheduled, CFS was recommending that Mother's reunification services be terminated and a section 366.26 hearing be set. The fact that Mother's six-month review hearing was postponed due to COVID-19 benefited Mother as it provided her with additional time to enroll and complete an inpatient substance abuse program and show her ability to engage with E.G.

It is well-established that "'[r]eunification services are voluntary, and cannot be forced on an unwilling or indifferent parent. [Citation.]' [Citation.] . . . 'The requirement that reunification services be made available to help a parent overcome those problems which led to the dependency of his or her minor children is not a requirement that a social worker take the parent by the hand and escort him or her to and through classes or counseling sessions. A parent whose children have been adjudged dependents of the juvenile court is on notice of the conduct requiring such state intervention. If such a parent in no way seeks to correct his or her own behavior or waits until the impetus of an impending court hearing to attempt to do so, the legislative purpose of providing safe and

15

stable environments for children is not served by forcing the juvenile court to go "on hold" while the parent makes another stab at compliance.'" (*In re Christina L.* (1992) 3 Cal.App.4th 404, 414-415 (*Christina L.*); *In re Nolan W.* (2009) 45 Cal.4th 1217, 1233.)

B. *Reasonableness of Services Provided*

Citing to *Serena M. v. Superior Court* (*Serena M.*) (2020) 52 Cal.App.5th 659, Mother also contends the juvenile court erred in finding CFS offered reasonable services because CFS failed to give her an opportunity to visit E.G. in person. She thus believes the court erred by not ordering additional visits.

Except under circumstances not applicable here, reasonable reunification services must be offered when a child is removed. (§ 361.5, subd. (a); *Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1501.) Whether the reunification services offered were reasonable and suitable is judged according to the circumstances of the particular case. (*Earl L. v. Superior Court*, at p. 1501.) "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)

We review under the substantial evidence standard the juvenile court's finding that reasonable services had been provided or offered. (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598.) In reviewing the challenged finding, we examine the record in the light most favorable to the juvenile court's order, to determine whether there is substantial evidence from which a reasonable trier of fact could have made the finding

16

under the clear and convincing evidence standard. (*In re Mary B.* (2013) 218 Cal.App.4th 1474, 1483; *In re Isayah C.* (2004) 118 Cal.App.4th 684, 694.) We construe all reasonable inferences in favor of a finding regarding the adequacy of an agency's reunification plan and the reasonableness of its efforts. (*Christopher D. v. Superior Court* (2012) 210 Cal.App.4th 60, 70; *In re Julie M.* (1999) 69 Cal.App.4th 41, 46.) We likewise resolve conflicts in favor of such a finding and do not reweigh the evidence. (*In re Jasmine C.* (1999) 70 Cal.App.4th 71, 75.)

Mother's reliance on *Serena M.*, *supra*, 52 Cal.App.5th 659 is misplaced because that case is distinguishable from the present matter. In *Serena M.*, the mother was denied visits throughout the entire 18 months of services because visits were initially found to be detrimental to her 13-year-old daughter. The mother's visits were later approved under therapeutic supervision, however, the social worker did not pursue therapeutic supervised visitation because of the court's detriment finding and the child's unwillingness to visit her mother. (*Id*. at pp. 663, 676-677.) The mother appealed, and the appellate court found the juvenile court erred in finding the mother was offered reasonable services. (*Id*. at pp. 677-678.) The court explained, "In this case, mother's only hope for repairing her damaged relationship with [her teenage daughter] and reunifying with her was to work through their issues in a therapeutic setting. However, the juvenile court made that impossible by forbidding in-person contact. While the evidence supports its decision for an initial period, it does not support depriving her of that for an entire 18-month period.

17

We conclude based on the evidence the court's no-contact visitation order was not reasonable sometime around February 2019 and afterward." (*Ibid*.)

In this case, Mother was granted visitation with E.G. throughout the proceedings and no finding was ever made that such visits were detrimental. Mother had weekly in-person visits for the initial six months of services from September 2019 through March 2020. The initial six-month review hearing set for April 30, 2020, was subsequently continued due to COVID-19. Thereafter, Mother had video visits with E.G. between May through August 2020 while Mother was in an inpatient substance abuse program at Gibson House. She then resumed in-person visits with E.G. in September 2020. While Mother attempts to blame CFS and the pandemic for her inability to have in-person visits or bond with E.G. during the proceedings, the record demonstrates that the impact was short-lived and Mother had the opportunity to bond with her child. When she did avail herself to in-person visits, the quality of those in-person visits did not actually improve until she completed her substance abuse program and achieved sobriety in a secured setting. The fact that Mother did not actively engage with E.G. and bond with her during those initial seven months of in-person visits, despite being given the opportunity to do so, does not mean services were unreasonable.

The COVID-19 pandemic has affected nearly everybody, and it is unfortunate the pandemic has prevented Mother from having personal visits with E.G. during the months of June, July, and August 2020. The juvenile court found, however, that the six-month hearing would have been held in April 2020 if not for the COVID-19 shutdown and that

18

in April 2020, the record was clear that visits were not going well and Mother was not in compliance with her case plan. The court also noted that Mother received more services due to the shutdown, and to her credit, engaged in services. The court further explained that E.G. was removed at birth and Mother had no significant bond with her and that Mother was not raising her other children but rather, the maternal grandmother was raising the children. Although the court recognized that Mother had made significant progress in her case plan since May 2020, it found there was no substantial probability E.G. could be returned to her care in six weeks given the lack of bonding and short time of sobriety. Contrary to Mother's claim, we find this is not a COVID-related case or issue because Mother had plenty of time to engage in services before April 2020.

There is abundant evidence supporting the juvenile court's finding that Mother was provided reasonable services. As we have recounted, CFS offered Mother extensive services, nearly all of which she refused to accept until she enrolled in an inpatient substance abuse program at Gibson House. (See *Christina L.*, *supra*, 3 Cal.App.4th at pp. 414-415.)

C.    *Substantial Probability of Return*

Lastly, Mother argues the juvenile court erred in terminating her services and setting a section 366.26 hearing because she had, by clear and convincing evidence, participated regularly and made substantive progress in her case plan.

When a dependent child is removed from parental custody, "the juvenile court ordinarily must order child welfare services for the minor and the parent for the purpose

19

of facilitating reunification of the family. (§ 361.5, subd. (a).) For a child under three years of age at the time of removal, as [E.G.] was, reunification services are presumptively limited to six months." (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 843 (*Tonya M.*).) This is because the "'"unique developmental needs of infants and toddlers"'" [citation] justif[y] a greater emphasis on establishing permanency and stability earlier in the dependency process." (*M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 175 (*M.V.*).)

Therefore, as our high court has explained, for the parent of a child under three at the time of removal, the statutory scheme of providing reunification services establishes "three distinct periods and three corresponding distinct escalating standards." (*Tonya M.*, *supra*, 42 Cal.4th at p. 845.) In the first period—a phase from the jurisdictional hearing to the six-month review hearing where services are "presumed"—"services are afforded essentially as a matter of right." (*Ibid*.) In the second period—a phase from the six-month review hearing to the 12-month review hearing where services are "possible"—"a heightened showing is required to continue services." (*Ibid*.; see § 366.21, subd. (e)(3) [requiring the court to continue the case to the 12-month hearing where "there is a substantial probability that the child . . . *may* be returned to his or her parent . . . within six months" (italics added)].) And in the third period—a phase from the 12-month review hearing to the 18-month review hearing where services are "disfavored" (*Tonya M.*, at p. 845)—services can be continued only if there is a "substantial probability that the child *will* be returned" within the extended time period (§ 366.21, subd. (g)(1), italics

20

added), and "the juvenile court finds specifically that the parent has 'consistently and regularly contacted and visited with the child,' made 'significant progress' on the problems that led to removal, and 'demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs.'" (*Tonya M.*, at p. 845, quoting § 366.21, subd. (g)(1)(A)-(C); see *M.V.*, *supra*, 167 Cal.App.4th at p. 178 ["the court can only continue the case to the 18-month review if it finds a substantial probability the child will be returned to the parent; moreover, the court must find all three of the listed factors to justify a finding of a substantial probability the child will be returned to his or her parent"].)

In the present case, Mother argues that she participated regularly and made substantial progress in her case plan to warrant the continuation of services. As an initial matter, we note that an 18-month review hearing must "occur within 18 months of the date the child was originally taken from the physical custody of his or her parent." (§ 366.21, subd. (g)(1).) Here, E.G. was removed from Mother's physical custody on September 11, 2019. Thus, the juvenile court was required to consider whether there was a substantial probability of return in light of the time remaining, a period of slightly under two months. (See *Tonya M.*, *supra*, 42 Cal.4th at p. 846 ["if at most four months remain until the next review hearing (i.e., the 12-month hearing or 18-month hearing), at most only four months of services can by law be ordered, and the juvenile court therefore

21

should consider only what the impact of *those* four months of services would be on the parent and child"].)

There is no dispute that Mother maintained consistent contact with E.G. and that she actively engaged in her reunification plan once she entered Gibson House on May 26, 2020. Indeed, the juvenile court commended Mother for her participation in services and the progress she had made. We too applaud Mother's efforts, and hope that she will continue to work toward stabilizing her life circumstances. However, substantial evidence supports the juvenile court's finding that E.G. was unlikely to be returned to Mother within the six weeks remaining before the expiration of the 18-month review period. Mother had recently obtained sobriety within the confines of a structured setting and lacked a bond with E.G.

Furthermore, Mother did not enroll in her inpatient substance abuse program until May 2020, which was after the initial six months had lapsed. The six-month review hearing was initially set for April 30, 2020, but was continued due to COVID-19. In the initial six months of being provided services, Mother was referred for an assessment with a substance abuse counselor. In January 2020, she was provided information for a substance abuse program. She did not complete the assessment until February 4, 2020, and sabotaged herself by claiming she had not consumed substances since February 2019. As a result, she was informed she did not qualify for an outpatient program. At the September 15, 2020 contested six-month hearing, Mother stated that she was untruthful

when she told the provider that she had stopped using in February 2019 and admitted to using methamphetamines right before she entered Gibson House on May 24 or 25, 2020.

Therefore, as the juvenile court noted in its ruling, if the hearing had gone forward as originally scheduled on April 30, 2020, Mother would not have been compliant with her case plan. In addition, at that time, the record was clear that visits had not been going well. The court found that there was no substantial probability E.G. would be returned to Mother's care in six weeks given the lack of bonding and short time of sobriety. This finding is amply supported by the record. (See § 366.21, subd. (g)(1)(B).) We decline to reweigh the evidence in this case. (See *In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53 [the juvenile court alone determines where the weight of the evidence lies].)

By failing to address her substance abuse problems until approximately nine months after E.G. was removed from her care, Mother prevented the court from safely returning E.G. to her custody. Although some of the delay was caused by the pandemic, Mother had the opportunity to engage in services about six months before the general pandemic order went into effect. She had the ability to complete her case plan by the review hearing but did not do so. Moreover, she had recently obtained sobriety while in a confined, structured setting and lacked a bond with E.G. On that evidence, the juvenile court could properly find there was not a substantial probability E.G. could be returned to her custody in the six weeks remaining before the 18-month review hearing.

Accordingly, we find no error on this record.

## IV

## DISPOSITION

The writ petition is denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON                       
                                                    J.

We concur:


MILLER                    
          Acting P. J.


RAPHAEL              
               J.

24